IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CHESTER BRANDON, III, et al.,

          Plaintiffs,

v.                        CIVIL ACTION NO.   2:24-cv-00265

COMMISSIONER WILLIAM
K. MARSHALL, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the Plaintiffs' *Verified Class Complaint for Declaratory Injunctive Relief* (Document 1), the *Plaintiffs' Emergency Motion for Temporary and Preliminary Injunctive Relief* (Document 2) and exhibit(s), and the *Memorandum Supporting Plaintiffs' Emergency Motion for Temporary and Preliminary Injunctive Relief* (Document 3).  On May 30, 2024, the Court held a hearing on the motion for a preliminary injunction, during which both parties presented witness testimony.  The Court has considered the facts presented in the verified complaint, the exhibit attached to the motion for a preliminary injunction, and the testimony presented during the hearing.

**FACTS**

The named Plaintiffs are Chester Brandon, III, and Harold Midkiff.  The Plaintiffs bring this claim on behalf of a class, defined to include:

> all persons on parole under the authority of the WVDCR [West Virginia Division of Corrections and Rehabilitation] who, after having been previously approved by the Parole Board or their parole officer to be housed at a non-West Virginia Alliance of Recovery

> Residences (WVARR) certified recovery residence and not having violated any element of their parole, have been or are being forced by Defendants to vacate their previously approved housing by May 31, 2024.

(Compl. at ¶ 24.)   The Defendants are William K. Marshall, Commissioner, the executive head of the West Virginia Division of Corrections and Rehabilitation (DCR), Ronald Arnold, the Director of Parole Services for the DCR, and Anne Thomas, the Assistant Commissioner of the DCR, Bureau of Community Corrections.   All are sued in their official capacities.   This case arises in response to a recent decision by the Defendants to require parolees who were released, in accordance with approved home plans to recovery residences that are not certified pursuant to state law, to vacate those residences and find other housing with limited notice.

Defendant Anne Thomas described the change in policy that led to the directive to move parolees living in uncertified recovery residences.   A state law passed in 2019 established a process for certification of recovery residences and barred referrals from DCR, among others, to non-certified recovery residences.   Recovery residences are certified by the West Virginia Alliance of Recovery Residences (WVARR).   Legislation passed this year, Senate Bill 475, amended that statute to provide that parolees may not be "released" to uncertified recovery residences.   She distinguished between "referrals," which occur when staff find a place to send a parolee, and "releases," which includes anyone released on parole, including to residences they identified for themselves.   Ms. Thomas explained that DCR interpreted that change to be retroactive, requiring all parolees currently in uncertified recovery residences to move.   She issued a memo on March 29, 2024, explaining the change to parole officers and other relevant staff members, directing that all parolees be required to find alternative housing by May 31, 2024.   The

memo did not require the impacted parolees to be notified within a particular timeframe or describe a process for finding such housing or addressing an inability to do so. She testified that individuals who were unable to find alternative housing by May 31, 2024, would be able to remain in their previously approved residences until they found an alternative.

Ms. Thomas testified that DCR intends to work with impacted parolees to find housing and will not revoke anyone's parole because of this change in policy. However, she also explained that homelessness is not acceptable on parole, and individuals who become homeless may be sanctioned with a jail sentence of up to 30 days while they try to secure housing. Plaintiff Harold Midkiff testified that he was aware of someone who went to a Salvation Army shelter as a result of the change in policy. Ms. Thomas also described a parolee who did have a revocation filed because, after he had been informed that he needed to vacate his previously approved residence by May 31, 2024, he moved without first obtaining approval of his new residence from his parole officer.

The Plaintiffs presented testimony from Beverly Sharp, who runs a reentry nonprofit providing resources and support to assist people in reentering society after incarceration. She explained that there is a shortage of housing for previously incarcerated individuals in West Virginia, regardless of certification, making it nearly impossible to find acceptable housing for a large group of displaced parolees. In particular, she testified that people who had been convicted of sex offenses and/or violent crimes lacked options, and no recovery residences currently certified by WVARR accept sex offenders or people with lengthy violent criminal records. She and staff members at her organization called every certified recovery residence in the state on behalf of clients following the change in DCR policy, and found only two open beds, one of which they

were able to secure for a client. Both Ms. Sharp and Robert Yost, the regional director for Hope Center Ministries, where the named Plaintiffs were placed, described a chaotic scramble to find housing for the displaced parolees, and both described conversations with DCR agents in which they were informed that essentially any housing would be approved – a homeless shelter, a camper at a campground, etc.

The two named Plaintiffs, and a third putative class member, David Patterson, were released on parole to Hope Center Ministries near Parkersburg, West Virginia. Mr. Midkiff and Mr. Patterson both provided testimony during the preliminary injunction hearing. The regional director of Hope Center, Robert Yost, also testified. Hope Center is a religion-based spiritual mentorship program that provides housing, substance abuse treatment, vocational training, employment assistance, and other supportive services. Hope Center Ministries is a national non-profit with locations across the country. The Parkersburg location has been open approximately three years and has been receiving newly released parolees for about two years. It has national accreditations as a recovery support specialist but is not WVARR certified. Hope Center is currently seeking WVARR certifications but was told it could take several months because of a backlog as uncertified residences seek to come into compliance with the new law. Mr. Brandon, Mr. Patterson, and Mr. Midkiff were all doing well at the Hope Center and found the supportive programming valuable, particularly in helping them maintain sobriety from controlled substances. Hope Center was approved as their release residence in each of their Home Plans when they were granted parole, and they had no parole violations or problems while there.

Their parole officer informed them on or about May 7, 2024, that they would need to leave Hope Center by May 31, 2024. They, their parole officer, and Hope Center staff sought to identify

4

similarly supportive housing with little success. Mr. Midkiff and Mr. Patterson were both moved to the Union Mission, a men's shelter in Charleston, West Virginia, on May 29, 2024. The Union Mission offers a long-term inpatient substance abuse treatment program, which Mr. Midkiff believes he will be able to join. Mr. Midkiff expressed concern that the disruption of his stable housing and treatment program, with staff he found supportive, would increase his risk of relapse. Mr. Patterson likewise expressed concern with being moved from Hope Center to a shelter. He did not initially even recall the name of the shelter where he now resides. Mr. Patterson described positive relationships with staff and volunteers at the Hope Center that he had developed over the approximately nine months he had been there. They both stated that they wanted to remain at the Hope Center. No other residence had been secured for Mr. Brandon at the time of the hearing, and he remains at the Hope Center.

At the conclusion of the hearing, the Court withheld ruling on the broader motion for a preliminary injunction but ordered that no additional parolees be moved from their previously approved residences pending the Court's ruling.

## STANDARD OF REVIEW

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides that a temporary restraining order may be issued without notice

> only if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). A preliminary injunction may be issued "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Defendant has appeared and responded in this matter.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must satisfy all four requirements. *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated,* 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010). The standard requires the plaintiff "to make a clear showing of likelihood of success on the merits." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) (quotation marks omitted). The final two factors, "assessing the harm to the opposing party and weighing the public interest…merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

The Plaintiffs argue that a pre-certification class-wide preliminary injunction is appropriate to prevent the Plaintiffs and putative class members from the loss of liberty and other "irreparable harms, including loss of therapeutic and support relationships important to the ongoing fight against relapse into substance abuse habits, and loss of employment obtained and pursued as part of the rehabilitative process." (Pl.s' Mem. at 6.) They assert that un-approving previously approved housing and treatment placement for parolees, without any change in conditions, is arbitrary and capricious under these circumstances. They note that the newly enacted legislation does not require removal of people already placed in non-certified homes. They contend that they

are likely to succeed on their substantive due process claim because the state action is arbitrary, unjustifiable, and outrageous, and threatens their liberty interest in continued release on parole. The Plaintiffs stress the harm caused by removing them from supportive housing, where they have built positive relationships and progressed in their recovery. They also argue that the balance of equities and public interest favor preliminary relief because the DCR is in no way harmed by permitting them to continue to reside in their previously approved recovery residences, ensuring continued support and rehabilitation for parolees protects the public, and risking unnecessary reincarceration into overcrowded jails and prisons harms both the parolees and the public. They urge a preliminary injunction to preserve the status quo.

The Defendants argue that there is no imminent threat of irreparable injury. They contend that the parolees impacted by the policy change will have to have new home plans approved by the agency, and those home plans will be designed to meet their needs. They emphasize Ms. Thomas's testimony that DCR will work with parolees who are struggling to find new housing, and that there is no plan to revoke parole for those who cannot find new housing before the deadline, and there is therefore no deprivation of liberty. They contend that parolees will still be able to access treatment options and employment opportunities.

### A. Likelihood of Success on the Merits

The Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983, asserting violation of their 14th Amendment substantive due process right to liberty. 42 U.S.C. §1983 "imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Callahan v. N. Carolina Dep't of Pub. Safety*, 18 F.4th 142, 145 (4th Cir. 2021) (quoting 42 U.S.C. § 1983). "The Fourteenth Amendment Due Process Clause protects

7

individuals from states that would 'deprive any person of life, liberty, or property without due process of law.'" *Id.* (quoting U.S. Const. Amend. XIV, § 1.) "[A] plaintiff asserting a § 1983 substantive due process claim must allege both the deprivation of his life, liberty, or property interest by a state actor, and that the deprivation of this interest was arbitrary in the constitutional sense." *Id.* (internal quotation marks omitted). Cases analyzing substantive due process rights address two "strands" of the doctrine: one that "protects rights that are 'fundamental,'" and a "second [that] 'protects against the exercise of governmental power that shocks the conscience.'" *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (citing and quoting *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)). Generally, when the "claimed violation is by executive act," "the issue of fatal arbitrariness should be addressed as a threshold question, asking whether the challenged conduct was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999).

The Supreme Court has recognized that "the liberty of a parolee," though subject to restrictions not applicable to the general public, "is valuable and must be seen as within the protection of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). In *Hawkins v. Freeman*, the Fourth Circuit considered a substantive due process claim involving a plaintiff who had been released on parole, despite his ineligibility under state law, then returned to prison when officials realized their error. 195 F.3d at 737. In analyzing whether the governmental conduct was fatally arbitrary, the court outlined descriptions of the type of conduct that can support a substantive due process claim, noting that careful analysis of the specific context and circumstances is necessary. *Id.* at 742. "It is conduct that involves abusing executive power, or employing it as an instrument of oppression," that is "more blameworthy than simple

8

negligence," and that is "intended to injure in some way unjustifiable by any government interest." *Id.* (internal punctuation and citations omitted). The court concluded that the decision at issue in *Hawkins* could not meet that test, as "[n]othing about it suggests any element of vindictiveness or of power exercised simply to oppress," and "[t]here were legitimate governmental interest and objectives a-plenty to justify the act." *Id.* at 746.

The Defendants assert that they acted in an effort to comply with newly enacted legislation. West Virginia Code Section 16-59-2, governing voluntary certification of recovery residences, was amended this year to, inter alia, provide that:

> A recovery residence without a valid certificate of compliance, as provided in § 16-59-2 of this code, is prohibited from receiving a referral or receiving a person released from prison for the placement of any prisoner, parolee, probationer, or prospective, current, or discharged patient, or client from the Division of Corrections and Rehabilitation, the Parole Board, the county probation officers, day report center, municipal courts, or a medical or clinical treatment facility that receives funds for its operation from the State Treasury.

W. Va. Code § 16-59-2(j) (eff. June 7, 2024). Both the previous and updated versions of W. Va. Code § 16-59-3 include language instructing the same entities not to "make a referral of any prisoner, parolee, probationer, or prospective, current or discharged patient, or client to a recovery residence unless the recovery residence holds a valid certificate of compliance…." W. Va. Code § 16-59-3(b) (eff. May 20, 2019 – June 6, 2024) and § 16-59-3(a) (eff. June 7, 2024).

As a general rule, retroactivity is disfavored. *Landgraf v. USI Film Prod.*, 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). A statute has retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280, 114 S.Ct. 1483. In West

9

Virginia, "[a] statute that diminishes substantive rights or augments substantive liabilities should not be applied retroactively to events completed before the effective date of the statute ... unless the statute provides explicitly for retroactive application." Syl. pt. 2, *Pub. Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538, 540–41 (1996); *see also* W. Va. Code § 2–2–10(bb) ("A statute is presumed to be prospective in its operation unless expressly made retrospective."). Further, "[t]he presumption is that a statute is intended to operate prospectively, and not retrospectively, unless it appears, by clear, strong and imperative words or by necessary implication, that the Legislature intended to give the statute retroactive force and effect." Syl. pt. 3, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807, 810 (2002) (internal quotation marks omitted).

Nothing in Senate Bill 475, the legislation that amended the relevant sections of state code, indicates that it has retroactive effect. As such, the change in state law provides no justification for the Defendants' actions. Therefore, the Court must consider whether the Defendants' decision to require the Plaintiffs, and the purported Plaintiff class,[1] to vacate the uncertified recovery residences, that were previously approved in their home plans, comports with due process. Based on the testimony presented to the Court, the Court finds that the Plaintiffs' liberty is meaningfully at stake. First, although the Defendants indicated that they do not intend for members of the Plaintiff class to become homeless or be revoked directly because of their inability to secure alternative housing, there was testimony that parolees were transferred to homeless shelters as a result of this policy, and that homelessness can result in incarceration for people on parole. Thus,

---

1 "[C]ourts may enter class-wide injunctive relief before certification of a class." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019); *Mullins v. Cole*, 218 F. Supp. 3d (S. D. W. Va. 2016) (Chambers, J.) (granting preliminary injunction based on class-wide harms prior to class certification).

there is a direct risk that people rendered homeless because of the Defendants' sudden insistence that they vacate the homes, that they secured and had approved prior to their release, will be jailed because no suitable housing is available to them.

In addition, there is a real risk that the Plaintiffs and putative class members will be revoked because of relapse or other violations that are far more likely after they lose the stability and support of their approved recovery residences. Mr. Midkiff testified that he tried multiple times to get approval for a home plan prior to his parole but could not obtain approval until he had identified Hope Center as a release residence. Presumably, the DCR requires certain parolees to be released to recovery residences, even if uncertified, because it determines that they are more likely to succeed on parole with the supports those residences offer, whether that is substance abuse treatment, therapy sessions, general structure and assistance building positive relationships, or vocational training and employment assistance. Suddenly removing parolees who are doing well in those residences and transferring them—with little effort at a smooth transition—to shelters or homes with less support risks interfering with their recovery and causing them to relapse, which may result in revocation. Even parolees moved to places with similar supportive programming available may suffer from the disruption. Adjusting to a new substance abuse treatment program, new therapists or other treatment providers, new participants in group therapy, finding a new vocational program or employer, if necessary, can all be particularly burdensome for formerly incarcerated people, as this Court regularly sees in handling a criminal docket and as the witnesses explained. Removing someone from a substance abuse treatment program that is working, with no process or meaningful explanation, may well trigger a relapse into active drug abuse, which

violates the conditions of release on parole. Thus, the Plaintiffs have demonstrated that this policy may well result in re-incarceration.

As discussed above, the Supreme Court has recognized that parolees have a liberty interest in remaining free from unjustified re-incarceration. The Plaintiffs here have presented sufficient evidence to show a likelihood of success in demonstrating that the Defendants' actions threaten that interest. The Court must next consider whether the Defendants' actions are sufficiently egregious and oppressive to be constitutionally arbitrary. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–47 (1998). The Defendants approved home plans and released the Plaintiffs and putative class members to the uncertified recovery homes where they participated in assorted supportive programming. Following amendments to a statute that, on the record before the Court, did nothing to alter the Plaintiffs' status or the legality of their release to these placements—release which pre-dated the statutory amendment—the Defendants gave them approximately three weeks' notice to leave those residences, despite a long-standing shortage of housing of any sort for parolees. Despite previously requiring these individuals to secure housing in a recovery residence in their home plans, the Defendants now encourage them to find anything with running water and electricity, or simply transport them to a shelter. In short, the Defendants placed all the burden of a crisis they manufactured on the shoulders of those most vulnerable and least able to weather it.[2] Giving people already facing barriers to finding housing three weeks to move is outrageous. Suddenly removing people with substance abuse disorder from treatment programs they are progressing in and wish to continue, with the constant threat that relapse can result in revocation,

---

2 For example, there is nothing in the record suggesting efforts to facilitate or pressure WVARR to process certification applications of recovery residences like the Hope Center before the June 7 effective date of the legislation, rather than displacing residents.

shocks the conscience. In ordering the Plaintiffs to leave their recovery residences without sufficient time or any process to challenge the directive, the Defendants disregarded the interests, and indeed the humanity of the affected parolees, even though they are in large part the group that the certification requirement was designed to protect. Treating the parolees as though their lives are of no consequence and cavalierly throwing away their hard work and progress in recovery and rehabilitation supports a finding of oppressive ill-intent, not mere negligence.

The outrageousness of the executive action here is unmitigated by any countervailing governmental interest. Certification of recovery homes is, of course, a valid legislative priority. However, the legislation does not require disruption of existing placements, and the policy is not, for instance, to transfer people from uncertified recovery residences into appropriate certified recovery residences as space becomes available. Instead, the Defendants chose to unilaterally displace vulnerable parolees, causing some to become homeless and risking the recovery efforts of others. Therefore, the Court finds that the Plaintiffs are likely to succeed on the merits.

### B. Irreparable Harm

The Court's previous discussion touched on the harm caused to the Plaintiffs in the absence of preliminary relief, and the Court will not belabor the point. Removing the Plaintiffs from stable placements, which provide both housing and treatment, causes irreparable harm by interrupting that treatment, disrupting positive relationships, and depriving them of stable housing. Although programs with similar treatment availability were secured for some of the impacted parolees, removing them from a consistent treatment program in which they were successful for the uncertainty of a new program is harmful. Mr. Yost testified about the program phases at Hope Center. Starting a new program will inevitably discard some progress, particularly progress that

13

derives from relationships with treatment providers and fellow participants that develop over time. Discontinuing a treatment program without any basis in the participant's treatment goals, behavior, progress, or needs, constitutes irreparable harm in these circumstances.

### C. Balance of Equities and Public Interest

The Court further finds that the public interest supports an injunction. As the Supreme Court explained:

> The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.

*Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S. Ct. 2593, 2601–02, 33 L. Ed. 2d 484 (1972) (internal citations omitted). The Plaintiffs' chances of successfully rebuilding their lives, overcoming addiction and mental health problems, repairing family relationships, and securing gainful employment are diminished when they are removed from the very programs designed to help them accomplish those goals. The public has a strong interest in ensuring that people released on parole are able to transition successfully into law-abiding, productive citizens. The injunction requested in this case ensures that the Plaintiffs and putative class members cannot be needlessly removed from supportive programs where they wish to remain.

The Defendants did not identify any harm they will suffer by continuing the status quo for those parolees who were released prior to the amendment to W. Va. Code § 16-59-1 *et seq.* The Court would also note that the certification issue appears likely to be temporary. DCR will no

longer release parolees to uncertified recovery residences, those recovery residences that are eligible for certification will presumably pursue it, as Hope Center is, and parolees currently enrolled in uncertified recovery residences will presumably complete the programs within the next months or year(s). The issue here is only whether the Plaintiffs and putative class members may remain in the uncertified recovery residences to which they were released while WVARR processes certification applications prompted by the 2024 amendments.

Finding that the factors relevant to a preliminary injunction each weigh in favor of the Plaintiffs, the Court finds that the Plaintiffs' motion for preliminary relief should be granted.

### D. Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction…only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Plaintiffs argue that the bond should be waived or nominal because they are indigent, the public has an interest in the issues raised herein, and the preliminary injunction requested will not result in monetary costs or damages to the Defendants. Finding that the Defendants would sustain no damages should the injunction granted herein be found to be wrongful, and in light of the public interest in this matter, the Court finds that no bond should be required.

### CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Plaintiffs' Emergency Motion for Temporary and Preliminary Injunctive Relief* (Document 2) be

**GRANTED**. Specifically, the Court **ORDERS** that the following **INJUNCTIVE RELIEF** be **GRANTED**:

1. The Defendants are **DIRECTED** to return to the status quo before the Defendants began forcing individuals out of parole approved, uncertified recovery residences by ceasing to force Plaintiffs and absent class members out of their parole approved housing at recovery residences;

2. The Defendants are **DIRECTED** to permit members of the absent class who have already been removed from their parole approved housing at recovery residences to return to their prior housing arrangements, if so desired; and

3. The Defendants are **DIRECTED** to permit any member of the putative class who has not yet been removed from their recovery residence housing to stay in that housing—absent any unrelated change in circumstance—until such time as sufficient recovery residence housing meeting the state's certification requirement becomes available for the class.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:       June 4, 2024

*/s/ Irene C. Berger*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA